## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMERICAN BUILDERS INSURANCE COMPANY, | No. 4:19-CV-01497 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| KEYSTONE INSURERS GROUP and EBENSBURG INSURANCE AGENCY, | |
| Defendant. | |

## MEMORANDUM OPINION

### AUGUST 4, 2023

This case is about three sophisticated commercial parties in the insurance industry that entered into what appears, in hindsight, to be a somewhat unsophisticated business arrangement. That arrangement led to this complex litigation, which generally isn't a good thing for a business arrangement to lead to.

Plaintiff American Builders Insurance Company ("ABIC") sues Defendant Ebensburg Insurance Company ("Ebensburg") for its allegedly tortious misrepresentations in an application to ABIC for workers' compensation insurance coverage on behalf of Ebensburg's customer, Custom Installations Contracting Services, Inc. ("Custom"). The misrepresentations at issue involve whether Custom was engaged in roofing work and the maximum height of its operations.

But before Ebensburg sent its insurance application to ABIC on Custom's behalf, ABIC ceased writing workers' compensation insurance for contractors engaged in roofing work. On Custom's application, Ebensburg indicated that Custom didn't engage in roofing work and only operated at fifteen feet above the ground or lower. On that basis, ABIC issued Custom a workers' compensation insurance policy.

Some time later, a Custom employee fell twenty-five feet from a rooftop while working on a commercial roofing job. The employee filed for workers' compensation benefits, which ABIC unsuccessfully opposed. ABIC then filed a civil action against Custom in the United States District Court for the Western District of Pennsylvania, which was ultimately dismissed for lack of jurisdiction.

In this action, ABIC brings several tort claims against Ebensburg. Ebensburg now moves for summary judgment on ABIC's claims, arguing in part that they're time-barred. The Court agrees, and for that reason, grants Ebensburg's motion for summary judgment.

# I.   BACKGROUND

## A.   Underlying Facts

### 1.   The Relationships Between ABIC, Ebensburg, and Keystone

ABIC is a Georgia-based insurance company that issues workers compensation insurance in the Commonwealth of Pennsylvania.[1] Ebensburg is an independent insurance agency operating in Pennsylvania owned by Carl DeYulis, and managed in part by Carl's son, Kurtis "Kurt" DeYulis.[2] ABIC and Ebensburg have a relationship with Keystone Insurers Group ("Keystone"), a third insurance company.[3]

The relationship between ABIC and Keystone is governed by an Agency Agreement, which grants Keystone the authority to sell ABIC's insurance products.[4] Although Keystone has the legal ability to sell insurance products, it does not do so.[5] Instead it acts as a franchise association that sits between retail-level insurance agencies like Ebensburg ("Retail Agencies") and large insurance carriers like ABIC, connecting the two to facilitate business.[6] Through working with Keystone, Retail Agencies could do business with carriers like ABIC on more favorable terms.[7]

---

[1]   Ebensburg Statement of Undisputed Material Facts ("SUMF"), Doc. 105 ¶ 2; ABIC Response to Ebensburg SUMF ("RSUMF"), Doc. 124 ¶ 2.

[2]   SUMF, Doc. 104 ¶ 1; RSUMF, Doc. 124 ¶ 1.

[3]   *See* Dep. of Lea Ann Hawk, Doc. 139 at 52:18-54:2; Dep. of Carl DeYulis, Doc. 105-1 at 52:18-54:2.

[4]   Agency Agreement, Doc. 109-7.

[5]   *See* Dep. of Brian Brusoski, Doc. 138-1 at 17:15-18:13.

[6]   *See* Franchise Agreement, Doc. 117-17 at B-4; Keystone Operating Manual, Doc. 109-6 at 4.

[7]   *Id.*; Hawk Dep., Doc. 139 at 88:23-89:3.

Keystone essentially operated as a sort of "matchmaker," connecting ABIC to its network of Retail Agencies.[8] Ebensburg is one of the Retail Agencies that is part of the Keystone association.[9] Its relationship with Keystone is governed by a Franchise Agreement.[10]

Through its affiliation with Keystone, Ebensburg had access to ABIC insurance products through ABIC's application system: eQuotes.[11] eQuotes is "an electronic format for exchange of underwriting information sent by the agent to the underwriter."[12] Retail Agencies had their own log-in credentials to access eQuotes system and obtain ABIC insurance for their customers.[13]

### 2.    ABIC's Changes Its Underwriting Guidelines

ABIC could and would change its underwriting guidelines from time to time. In 2011, ABIC revised its prior underwriting guidelines to require that all roofing risks be pre-inspected prior to a release of a quote from the underwriting department.[14] The new guidelines (the "2011 Roofing Underwriting Guidelines"),

---

[8]   Brusoski Dep., Doc. 138-1 at 17:22-20:16.
[9]   *See* Carl DeYulis Dep., Doc. 105-1 at 42:1-43:10, 52:15-54:19.
[10]  *See* Franchise Agreement, Doc. 117-17.
[11]  *See* Dep of Tom Maupin, Doc. 138-2 at 59:20-60:6. Tom Maupin was ABIC's Senior Vice President of Marketing. *See id.* at 14:16-15:18. In addition, the Court notes that the parties heavily dispute the particulars of the ABIC-Ebensburg relationship, specifically whether Ebensburg was a subagent of Keystone or warranted as such. But those facts are irrelevant to the Court's analysis in this Memorandum Opinion as it relates only to the statute of limitations on ABIC's claims rather than their merits.
[12]  Maupin Dep., Doc. 138-2 at 82:22-83:3; *see* Brusoski Dep., Doc. 138-1 at 58:10-19.
[13]  Maupin Dep., Doc. 138-2 at 83:19-84:24.
[14]  *See* Oct. 11, 2011 Email from Jean Byers, ABIC Underwriter, to Melanie Carr-Rachau, Keystone Program Division Client Liaison, Doc. 109-18 at 4.

provided that all roofing risks would "require pre-inspection prior to release of a quote from [ABIC]."[15] Later in October 2011, ABIC further amended the 2011 Roofing Underwriting Guidelines to require a "minimum premium requirement of $75,000 and to prohibit residential roofing risks of any kind."[16]

On November 3, 2011, ABIC issued a notice that it would not be underwriting "[r]oofing risks" in Pennsylvania.[17] It updated its underwriting guidelines to reflect that it would automatically decline customers who were classified as roofers by the Pennsylvania Compensation Rating Board.[18]

### 3.    Custom's Relationship with Ebensburg

In 2011, Bernard Dospoy, Custom's principal, contacted Carol Myers, an Ebensburg producer, to obtain a general liability insurance policy.[19] In 2012, Dospoy returned to Myers to obtain workers' compensation insurance.[20] Because Custom had never sought workers' compensation insurance before, it obtained a policy through the Commonwealth's State Workers' Insurance Fund ("SWIF").[21]

---

[15]  *Id.*
[16]  Oct. 13, 2011 ABIC Agent Bulletin, Doc. 109-19.
[17]  Nov. 3, 2011 Email from Lisa Kwon, Doc. 109-21.
[18]  ABIC Underwriting Grades, Doc. 109-24 at 15.
[19]  Myers Dep., Doc. 109-25 at 23:25-24:19. Ebensburg's "producers" would collect information about putative insureds and pass that information on to "raters" like Kurt DeYulis, who would convey the information to insurance companies to obtain quotes. *See* Kurt DeYulis Dep., Doc. 105-2 at 7:1-12:24.
[20]  *Id.* at 28:20-29:4
[21]  *See id.* at 29:5-31:12.

The SWIF ACORD[22] indicated that: (1) Custom engaged in commercial and residential carpentry; (2) Custom didn't perform any work over fifteen feet above the ground; (3) approximately 90% of Custom's work was residential and the remaining 10% was commercial; and (4) Custom used "basic hand tools" for its remodeling projects and to install replacement windows.[23] The Pennsylvania Compensation Rating Board ("PCRB") required the above information about Custom's operations to properly issue it "class codes" for the types of work it did.[24]

### 4.   Custom Applies for Insurance from ABIC

In 2015, Custom approached Ebensburg again to inquire about switching to a private workers' compensation insurer for more favorable rates.[25] On May 28, 2015, Kurt DeYulis prepared applications to several insurance carriers, including ABIC.[26] He used the information Ebensburg already had in its system to prepare those insurance applications.[27] He explained that when he completed Custom's insurance policy applications, he did not have "any understanding of the amount of business that [Custom] was doing [in 2015] or in prior years."[28] Kurt DeYulis explained that

---

[22]   An ACORD is a uniform document containing information about a liability insurance policy.
[23]   *See* SWIF ACORD, Doc. 109-28 at 4-9.
[24]   Myers Dep., Doc. 109-25 at 31:23-33:15.
[25]   *Id.* at 34:10-15; Kurt DeYulis Dep., Doc. 105-2 at 122:14-17; Ligda Dep., Doc. 138-3 at 41:13-22.
[26]   *Id.* at 122:18-123:19; Custom Timeline, Doc. 109-31.
[27]   Kurt DeYulis Dep., Doc. 105-2 at 67:18-68:15.
[28]   *Id.* at 70:21-71:2.

Ebensburg's customer service representatives or producers were responsible for contacting the customer for new information.[29]

Instead, Kurt DeYulis primarily relied on the SWIF ACORD and its "classification of [Custom's] business" through Custom's "class codes," as provided by the PCRB.[30] That information is what "ultimately determine[ed] the price and premium of the quote."[31] Accordingly, because Custom already had class codes from its SWIF insurance, Kurt DeYulis relied on those codes for Custom's ABIC application.[32] Only when he was working with a new customer would he independently determine the customer's class codes.[33] If the customer was already classified, as Custom was, Kurt DeYulis would look up the customer's codes on the PCRB's website.[34] He would "assume" that a customer's prior rating code would remain the same on subsequent renewals of the customer's insurance policy.[35] Therefore, on Custom's ABIC application, Kurt DeYulis indicated that Custom engaged in commercial remodeling, didn't work at heights higher than fifteen feet, and wasn't engaged in any other business other than commercial remodeling.[36] Kurt DeYulis admitted, however, that he did not personally know whether Custom did

---

[29] *Id.* at 74:14-24.
[30] *See id.* at 71:3-72:21.
[31] *Id.* at 71:11-12.
[32] *See id.* at 73:14-74:24.
[33] *Id.* at 73:14-74:7.
[34] *Id.* at 74:2-7.
[35] *Id.* at 74:8-13.
[36] *Id.* at 77:22-79:21.

roofing work.[37] Kurt DeYulis also stated on the application that Custom had not been denied or nonrenewed by an insurance company in the past.[38]

As expressed above, Kurt DeYulis also applied to several other insurance carriers on Custom's behalf.[39] As he did with the ABIC application, Kurt DeYulis didn't indicate that Custom did roofing work on the other applications.[40] On May 29, 2015, Eastern Insurance, one of the other insurance companies Ebensburg applied to on Custom's behalf, requested further information about Custom's operations in the form of a questionnaire (the "Eastern Supplemental Questionnaire").[41] On the same day, Kurt DeYulis forwarded that request to Karen Ligda, an Ebensburg customer service representative.[42] Ligda in turn sent the questionnaire to Bernard Dospoy to complete.[43] Dospoy returned the completed document to Ligda, who sent it back to Eastern Insurance.[44] The completed Eastern Supplemental Questionnaire was not shared with Kurt DeYulis.[45]

---

[37]  *Id.* at 80:6-13.

[38]  Kurt DeYulis Dep., Doc. 105-2 at 81:7-83:16. Kurt DeYulis understood the question to be specifically asking whether ABIC had declined, cancelled, or nonrenewed an application from Custom. *Id.* at 81:7-82:6. At that time, the other carriers to which Kurt DeYulis applied had not yet responded to Custom's applications and Custom had no record of a prior insurance denial because it was currently insured by SWIF, the only carrier it ever had. *See id.* at 82:18-83:6. Therefore, he answered no to the prior declination question on the Custom's ABIC application. *Id.* at 81:7-83:16.

[39]  *Id.* at 80:16-19.

[40]  *Id.* at 80:19-24.

[41]  Ligda Dep., Doc. 138-3 at 52:6-21; May 29, 2015 Email from Ray G. Battistoni, Senior Underwriter for Eastern Insurance, to Kurt DeYulis, Doc. 109-38.

[42]  Ligda Dep., Doc. 138-3 at 53:2-54:10.

[43]  May 29, 2015 Email from Battistoni to Kurt DeYulis, Doc. 109-38; Ligda Dep., Doc. 138-3 at 53:2-54:10; May 29, 2015 Fax Cover Sheet from Ligda to Bernard Dospoy, Doc. 109-39.

[44]  Ligda Dep., Doc. 138-3 at 54:11-55:3; Eastern Supplemental Application, Doc. 109-37.

[45]  Ligda Dep., Doc. 138-3 at 55:4-6; Kurt DeYulis Dep., Doc. 105-2 at 131:9-15.

On the Eastern Supplemental Questionnaire, Custom indicated that it engaged in "general building and remodeling," its work was evenly split between residential and commercial jobs, it used "OSHA-approved harnesses," its maximum height of operations was twenty feet, and 50% of its jobs involved working on rooftops.[46] There was also a space for the "percentage of strictly roofing jobs" which was left unanswered.[47] On June 22, 2015, Eastern declined to issue a quote for Custom "due to commercial work of 50%, and higher than normal roofing work."[48]

No one at Ebensburg revised Custom's ABIC application with the new information Custom submitted in the Eastern Supplemental Questionnaire or the fact that Eastern had declined to insure Custom. Kurt DeYulis didn't believe that Ebensburg had an obligation to update Custom's ABIC application with Eastern's declination because his answer that Custom had not been previously denied was accurate at the time and ABIC didn't ask any supplemental questions about declinations from other insurers.[49] He did express that he would have been obliged to update an application if there was an "exposure" or "classification" change.[50]

---

[46]   Eastern Supplemental Application, Doc. 109-37.

[47]   *Id.*

[48]   June 22, 2015 Email from Battistoni to Kurt DeYulis, Doc. 105-8.

[49]   Kurt DeYulis Dep., Doc. 105-2 at 90:8-91:7. Kurt DeYulis further explained that changes to applications might occur in the course of correspondence between Ebensburg and the insurance carrier. *See id.* at 93:16-94:18. Depending on the information requested, either he, an Ebensburg rater, or an Ebensburg customer service representative would correspond with the insurance carrier. *See id.* at 94:19-95:19.

[50]   *Id.* at 91:8-92:3.

Following Eastern's declination, ABIC responded to Custom's application with its own additional questionnaire (the "ABIC Supplemental Questionnaire").[51] DeYulis filled out the ABIC Supplemental Questionnaire himself, indicating that Custom operated at a maximum height of fifteen feet, didn't do exterior work above three stories, didn't perform roofing work, and used OSHA-required fall protection equipment.[52] His source for that information was Custom's SWIF ACORD.[53]

There are some inconsistencies between the SWIF ACORD and the answers DeYulis submitted in Custom's ABIC application and the ABIC Supplemental Questionnaire. For instance, the SWIF ACORD identified Custom as in the business of "commercial carpentry," whereas Kurt DeYulis identified Custom as engaged in "commercial remodeling."[54] He acknowledged the inconsistency but could not explain it, only noting that the basis for identifications was information in Ebensburg's system.[55]

As for the more material inconsistencies between Custom's answers to Eastern and ABIC's supplemental questions, Kurt DeYulis explained that he didn't compare the two applications and no one at ABIC contacted Ebensburg about any issues in Custom's applications.[56] But Kurt DeYulis also stated that if Custom had

---

[51]  *Id.* at 96:15-97:14; ABIC Supplemental Questionnaire, Doc. 109-32.
[52]  ABIC Supplemental Questionnaire, Doc. 109-32 at 2; Kurt DeYulis Dep., Doc. 109-33 at 97:15-98:18.
[53]  Kurt DeYulis Dep., Doc. 105-2 at 97:10-13.
[54]  *Id.* at 115:2-117:23.
[55]  *Id.* at 118:19-119:14.
[56]  *Id.* at 127:18-132:2.

informed Ebensburg that it did "roofing" that he would have "endorsed the roofing [class] code" or otherwise informed ABIC.[57]

On June 18, 2015, Jean Byers, an ABIC underwriter, requested Custom's "[four]-year currently valued loss runs" and balance sheet.[58] Karen Ligda responded on the same day providing the balance sheet and another Ebensburg employee provided the loss runs to ABIC at some point before July 17, 2015.[59] On July 17, 2015, Byers approved a workers' compensation insurance quote for Custom.[60]

### 5.    The James Scott Injury

In September 2015, Custom was engaged in a commercial roofing job in New Galilee, Pennsylvania.[61] James Scott had just began working for Custom.[62] He stepped through a skylight and fell from over twenty feet to the ground, incurring serious injuries.[63]

Scott filed a claim for workers' compensation benefits to ABIC.[64] ABIC subsequently terminated/declined to renew Custom's insurance policy.[65] Greg Krause, ABIC's then-Vice President of Underwriting, explained that on September 14, 2015, he received an email from Bruce Moseley, one of ABIC's claims

---

[57]   *Id.* at 134:3-16.
[58]   *See id.* at 109:16-110:17; July 8, 2015 Email from Byers to Ligda, Doc. 109-41.
[59]   eQuotes Printouts, Doc. 109-36 at 23.
[60]   *Id.*
[61]   Dep. of Bernard Dopsoy, Doc. 109-48 at 26:20-28:12.
[62]   *Id.* at 42:2-8.
[63]   *See* Compl., Doc. 1 ¶¶ 51-52; Ebensburg Ans., Doc. 21 ¶¶ 51-52.
[64]   *See* ABIC Notice of Temporary Compensation Payable, Doc. 105-17.
[65]   *See* ABIC Termination Notice, Doc. 105-15.

managers, informing Krause of a "potential large loss" from Scott's injury.[66] Mosely had learned about the potential loss from another ABIC employee on September 10, 2015.[67]

Krause was unsure whether he knew of the potential loss before that email but recalled receiving it.[68] He forwarded Moseley's email to Keith Strickland, ABIC's Underwriting Team Lead, asking him to "pull [Custom's] account."[69] He also expressed that "[r]oof repairs doesn't sound like something [ABIC] should be writing."[70]

Strickland responded later that day, explaining that ABIC wrote the Custom "account as new business effective [July 20, 2015]," and that the "risk was presented and programmed as commercial carpentry remodeling" with "[n]o indication of interior or exterior" remodeling.[71] He further explained that the "max[imum] height [was] indicated at [fifteen] feet per eQuotes," and that eQuotes indicated that Custom answered "'yes' to following OSHA fall protection guidelines" and "'no' to roofing performed by [the] insured's own employees."[72] On October 8, 2015, ABIC issued a Notice of Compensation Payable ("NCP").[73]

---

[66]   Sept. 14, 2015 Email Exchange, Doc. 105-18; *see* Krause Dep., Doc. 105-28 at 51:9-52:3.
[67]   Sept. 14, 2015 Email Exchange, Doc. 105-18.
[68]   *See* Krause Dep., Doc. 105-28 at 51.
[69]   Sept. 14 Email Exchange, Doc. 105-18.
[70]   *Id.*
[71]   *Id.*
[72]   *Id.*
[73]   NCP, Doc. 105-20.

6.   The   Western   District   Litigation   and   Workers'
Compensation Proceeding

In   September   2015,   ABIC   sued   Custom   in   the   Western   District   of

Pennsylvania, seeking recission of the insurance policy and alleging that Custom

committed   insurance   fraud.[74]   The   Honorable   Kim   R.   Gibson   granted   ABIC's

unopposed motion for partial summary judgment and entered an order rescinding

the insurance policy in September 2016.[75]

Following that order, ABIC filed review and termination petitions before the

Honorable   William   Gallishen   Sr.   of   the   Pennsylvania   Workers   Compensation

Adjudication Office, seeking recission of Custom's insurance policy and to void its

NCP.[76] While the workers' compensation litigation continued, ABIC moved for a

temporary restraining order and preliminary injunction to prevent other third parties

from requiring ABIC to continue paying benefits.[77]

After hearing arguments from ABIC, Scott, and several third parties, Judge

Gibson concluded that he did not have jurisdiction over ABIC's claim for recission

because   ABIC   could   obtain   relief   in   the   workers'   compensation   litigation   and

---

[74]   *Am. Builders Ins. Co. v. Custom Installations Contracting Servs., Inc.*, 2017 WL 5501357, at
     *1 (W.D. Pa. Aug. 18, 2017) ("*Custom*"), *aff'd*, 807 F. App'x 193 (3d Cir. 2020).
[75]   *Id.*
[76]   Workers Compensation Decision, Doc. 105-21 at 6.
[77]   *Custom*, 2017 WL 5501357, at *2.

13

dismissed the case.[78] The United States Court of Appeals for the Third Circuit later affirmed that decision on appeal.[79]

Following Judge Gibson's order dismissing ABIC's federal claims, the workers' compensation litigation continued. Judge Gallishen ultimately denied ABIC's petitions.[80] The Pennsylvania Workers' Compensation Appeals Board later affirmed Judge Gallishen's decision.[81]

## B.    Procedural History

In the instant action, ABIC's Complaint originally contained four causes of action, alleging that: (1) Keystone breached an agreement between ABIC and Keystone (Count I)[82]; (2) both Ebensburg and Keystone negligently breached their professional duties to use reasonable care in preparing Custom's insurance applications (Count II)[83]; (3) Ebensburg negligently misrepresented information in Custom's ABIC application (Count III)[84]; and Ebensburg fraudulently misrepresented information in Custom's ABIC application (Count IV)[85].

---

[78]   *Id.* at *3-7.
[79]   807 F. App'x 193 (3d Cir. 2020).
[80]   Workers' Compensation Decision, 105-21 at 17-21.
[81]   *James Scott v. Custom Installations Contracting Service*, A22-0358 (Pa. WCAB Apr. 28, 2023).
[82]   Compl., Doc. 1 ¶¶ 55-64.
[83]   *Id.* ¶¶ 65-72.
[84]   *Id.* ¶¶ 73-81.
[85]   *Id.* ¶¶ 82-91. ABIC also alleged that Keystone was vicariously liable for Counts III and IV because Ebensburg was Keystone's agent. *See id.* ¶¶ 78, 87.

All parties then moved for summary judgment or partial summary judgment.[86] ABIC and Keystone later settled ABIC's claims against Keystone and withdrew their motions, leaving only Counts II through IV against Ebensburg and Ebensburg's motion seeking summary judgment in its favor on those Counts.[87] Ebensburg's motion has been fully briefed and is now ripe for disposition.[88] For the reasons that follow, the Court grants Ebensburg's motion.

## II.    LAW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[89] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[90] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[91] Conversely, to survive summary judgment, a plaintiff must "point to

---

[86]   ABIC MpSJ, Doc. 108; Keystone MSJ, Doc. 106; Ebensburg MSJ, Doc. 104.
[87]   Doc. 154 (stipulation of dismissal).
[88]   The Court extends its appreciation to all counsel for their excellent briefing and presentation at oral argument. This was not an easy case, as counsel are well aware.
[89]   Fed. R. Civ. P. 56(a).
[90]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).
[91]   *Clark*, 9 F.3d at 326.

admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[92]

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[93] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[94] The Third Circuit explains that the nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[95] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[96]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[97] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[98] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule

---

[92]  *Id*.
[93]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[94]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).
[95]  *Betts v. New Castle Youth Development Center*, 621 F.3d 249, 252 (3d Cir. 2010).
[96]  *Port Authority of N.Y. and N.J. v. Affiliated FM Insurance Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (quoting *Childers v. Joseph*, 842 F.2d 689, 694-95 (3d Cir. 1988)).
[97]  *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).
[98]  *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

56(c)," the Court may "consider the fact undisputed for purposes of the motion."[99] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[100]

## III.   ANALYSIS

This Memorandum Opinion focuses on only one of Ebensburg's arguments in support of its motion for summary judgment: that ABIC's claims are time-barred. The Court's analysis proceeds as follows.

First, the Court must determine whether Pennsylvania's Borrowing Statute, 42 Pa. C.S. § 5521, applies to this litigation. The Court concludes that it does. Following that, the Court must compare the limitations periods for ABIC's claims under both Pennsylvania's and Georgia's tolling doctrines to determine which period is shorter. As the Borrowing Statute dictates, the shorter period applies. The Court concludes that equitable tolling is only appropriate until September 14, 2015 under both Georgia and Pennsylvania law. Accordingly, Pennsylvania's shorter two-year statute of limitations applies to ABIC's claims. As ABIC filed its original Complaint in August 2019, more than two years after September 14, 2015, its claims are untimely.

### A.   Pennsylvania's Borrowing Statute

---

[99]   Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[100]   Fed. R. Civ. P. 56(c)(3).

Ebensburg and ABIC first differ on the applicable statute of limitations. Ebensburg argues that Pennsylvania's two-year statute of limitations applies to its tort claims.[101] ABIC first argues that Georgia's six-year statute of limitations applies to its claims, but argues that if Pennsylvania's shorter statute of limitations applies, tolling is appropriate such that its claims are timely.[102]

It is black-letter law that "[a] federal court, sitting in diversity, follows the forum's choice of law rules to determine the applicable statute of limitations."[103] "As a general rule, Pennsylvania applies its own procedural law when it is the forum state."[104] And "[u]nder Pennsylvania law, a statute of limitations is considered procedural because it 'extinguishes the remedy rather than the cause of action.'"[105]

But Pennsylvania's Borrowing Statute, 42 Pa. C.S. § 5521, provides a "limited exception" to that rule.[106] It provides that "[t]he period of limitation applicable to a

---

[101]   MSJ Br., Doc. 112 at 5-12 (citing 42 Pa. C.S. § 5524).

[102]   Opp., Doc. 122 at 21-26.

[103]   *Ross v. Johns-Manville Corp.*, 766 F.2d 823, 826 (3d Cir. 1985) (citing *Guaranty Trust Co. v. York*, 326 U.S. 99 (1945)).

[104]   *Kornfeind v. New Werner Holding Co.*, 280 A.3d 918, 928 (Pa. 2022) (citing *Commonwealth v. Sanchez*, 716 A.2d 1221, 1223 (Pa. 1998)); *see also Ross*, 766 F.2d at 826 ("Pennsylvania courts ordinarily apply the Pennsylvania statute of limitations." (citing *Freeman v. Lawton*, 46 A.2d 205, 207 (Pa. 1946))); *Unisys Fin. Corp. v. U.S. Vision, Inc.*, 630 A.2d 55, 58 (Pa. Super. Ct. 1993) (explaining that the rule that Pennsylvania applies its own statutes of limitation did not change with "the adoption of the significant contacts/interest analysis on substantive choice of law matters by the [Pennsylvania Supreme Court] in *Griffith v. United Airlines, Inc.*, 203 A.2d 796 (Pa. 1964)." (citing *Cistone v. Ford Motor Co.*, 504 F. Supp. 328 (E.D. Pa. 1980))).

[105]   *Kornfeind*, 280 A.3d at 928 (quoting *Westinghouse Elec. Corp./CBS v. Workers' Comp. Appeal Bd. (Korach)*, 883 A.2d 579, 588 n.11 (Pa. 2005)); *see also Stephens v. Clash*, 2014 WL 2808599, at *4 (M.D. Pa. June 19, 2014) (Conner, J.), *aff'd*, 796 F.3d 281 (3d Cir. 2015) ("Pennsylvania courts generally apply [Pennsylvania's] statutes of limitations except when the claim accrues in a foreign jurisdiction." (citing *Ross*, 766 F.2d at 826 & n.3)).

[106]   *Ross*, 766 F.2d at 826 n.3.

claim accruing outside [Pennsylvania] shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, whichever first bars the claim."[107]

Ebensburg contends that the text of borrowing statute requires the Court to apply Pennsylvania's shorter two-year statute of limitations.[108] ABIC responds that the borrowing statute applies "only when two conditions are met: (1) the claim accrues in another state, and (2) the law of that state bars the claim before the statute of limitations."[109] ABIC therefore argues that the borrowing statute does not apply because Georgia's relevant statutes of limitations don't bar Counts II through IV.[110]

For support, ABIC cites to *Kornfeind v. New Warner Holding Co.*, where the Supreme Court of Pennsylvania observed that the borrowing statute's "use of 'period of limitation' coupled with 'claim' and 'accruing' evinces the legislature's intent to borrow only a foreign jurisdiction's statute of limitations when the foreign jurisdiction's statute of limitations would first bar a claim."[111]

But the *Kornfeind* court's observation doesn't support ABIC's argument—it merely explains the application of the statute. The statute's text instructs courts to

---

[107] 42 Pa. C.S. § 5521.
[108] Ebensburg Suppl. Br., Doc. 147 at 2-4.
[109] ABIC Suppl. Br., Doc. 148 at 9-10 (citing *Jacobs v. Halper*, 116 F. Supp. 3d 469, 478 (E.D. Pa. 2015)).
[110] *See id.* at 9-11.
[111] 280 A.3d 918, 927 (Pa. 2022); *see* ABIC Suppl. Br., Doc. 148 at 9-10 (citing *id.*; *Stephens v. Clash*, 2014 WL 2808599, at *4 (M.D. Pa. June 19, 2014), *aff'd*, 796 F.3d 281 (3d Cir. 2015) (Conner, J.)).

apply the shorter statute of limitations to the plaintiff's claim when it accrues outside of the Commonwealth. ABIC correctly identifies the test for the borrowing statute's applicability but misconstrues the result. Failure to meet either of the elements leads to the general rule: Pennsylvania's statute of limitations applies.[112]

To compare limitations periods as the Borrowing Statute requires, a court must account for "laws regarding when the statute of limitations begins to run and the applicability of any tolling provisions."[113] Both Ebensburg and ABIC present several arguments with respect to when ABIC's injury accrued and whether tolling is appropriate in these circumstances. Ebensburg argues that, under Pennsylvania's discovery rule, the statute of limitations began to run when ABIC realized that Scott was injured in a roofing accident.[114] ABIC argues that the statute should be tolled under either Pennsylvania's fraudulent concealment or inherent fraud doctrines, and that it was reasonably diligent in pursuing its claims.[115] Ebensburg responds that

---

[112] *See Hoppe v. SmithKline Beecham Corp.*, 437 F. Supp. 2d 331, 335 (E.D. Pa. 2006) (applying Pennsylvania's shorter statute of limitations and rejecting the plaintiff's argument that "the legislature did not intend to bar foreign plaintiffs from invoking their home jurisdiction's statute of limitations, where [they] [are] longer than Pennsylvania's" because "the Pennsylvania legislature chose clear, unambiguous language for the borrowing statute that is incompatible with [the] plaintiff's proposed application.").

[113] *Stephens*, 2014 WL 2808599, at *3 (citing *Frankentek Residential Sys., LLC v. Buerger*, 15 F. Supp. 3d 574, 581 (E.D. Pa. 2014)).

[114] *See* MSJ Br., Doc. 112 at 5-13.

[115] Opp., Doc. 122 at 21-27. Georgia law, however, would not apply the discovery rule to ABIC's claims for economic injuries. *See Posada v. Parker Promotions, Inc.*, 2023 WL 3295172, at *2 (M.D. Ga. May 5, 2023) ("In Georgia, absent a statutory provision providing a discovery rule, the rule is generally confined to cases of bodily injury that develop over time, and it does not apply to property damage claims." (citing *Corp. of Mercer Univ. v. Nat'l Gypsum Co.*, 368 S.E.2d 732, 733 (Ga. 1988)). O.C.G.A. § 9-3-31, which provides the four-year statute of limitation applicable to Counts III and IV, "does not provide a discovery rule for injury to personalty claims." *Id.* Nor does O.C.G.A. § 9-2-24, which provides the six-year statute of

ABIC had sufficient information to know of its claims such that tolling is inappropriate.[116]

In these circumstances, however, the Court need not assess the limitations period under Georgia law. If tolling is appropriate under either set of laws, it would toll ABIC's claims until the same date because the analysis is the same under either Pennsylvania or Georgia law. Georgia and Pennsylvania share a similar approach to tolling based on a defendant's fraudulent actions.[117] Even though Pennsylvania would apply the discovery rule to ABIC's claims and Georgia would not, the discovery rule shares a common element with the fraudulent concealment and inherent fraud doctrines: the statute of limitations will not be tolled beyond the date on which the plaintiff could reasonably have informed itself of its potential cause of action. As both statutes would begin to run on the same day and Pennsylvania has a shorter statute, Pennsylvania's limitations period will always be shorter than Georgia's. Accordingly, ABIC must show that tolling is appropriate under

---

limitations applicable to Count II. Accordingly, under Georgia law, the statute of limitations on ABIC's claims would begin to run when Ebensburg misrepresented information about Custom in July 2015, but would be tolled until ABIC obtained sufficient information to know of its claims against Ebensburg.

[116] Reply, Doc. 132 at 15-17.

[117] *Compare Sheet Metal Workers, Local 19 v. 2300 Grp., Inc.*, 949 F.2d 1274, 1280 (3d Cir. 1991) (explaining the standard for equitable tolling for a defendant's fraudulent acts in Pennsylvania), *with Jim Walter Corp. v. Ward*, 265 S.E.2d 7, 9 (Ga. 1980) (same, but applying Georgia law). To illustrate, if the Court accepted ABIC's tolling arguments that the statute of limitations should be tolled because of Ebensburg's fraudulent concealment, the statute would be tolled until November 7, 2021 under either Pennsylvania or Georgia law. Although ABIC's claims would be timely under either set of laws, Pennsylvania's two-year statute of limitations would still be shorter than Georgia's four- and six-year statutes of limitation.

Pennsylvania law such that its claims are timely.[118] The Court now turns to ABIC's arguments.

### B.     Application of the Tolling Doctrines

As noted above, ABIC argues that the limitations period on its claims should be tolled under either the fraudulent concealment or inherent fraud doctrine. Both doctrines "toll the statute of limitations until such time as the fraud has been revealed or should have been revealed by the exercise of due diligence by plaintiffs."[119] Similarly, "[t]he discovery rule prevents the statute of limitations from commencing until the plaintiff knows or reasonably should know: (1) that he has been injured, and (2) that his injury has been caused by another party's conduct."[120] Accordingly, ABIC's claims can be tolled until the day it reasonably knew or should have known of them under all three of the doctrines cited by the parties.[121]

---

[118]   However, the Court notes that the analysis would be the same under Georgia law, as evidenced by its citations to Georgia authorities discussing the fraudulent concealment doctrine.

[119]   *Sheet Metal Workers*, 949 F.2d at 1280 (quoting *Gee v. CBS, Inc.*, 471 F. Supp. 600, 622 (E.D. Pa. 1979), *aff'd*, 612 F.2d 572 (3d Cir. 1979)); *accord Fine v. Checcio*, 870 A.2d 850, 861 (Pa. 2005) ("[A] statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause.")

[120]   *Redenz by Redenz v. Rosenberg*, 520 A.2d 883, 885 (Pa. Super. Ct. 1987) (quoting *Pastierik v. Duquesne Light Co.*, 491 a2d 841, 842 (Pa. Super. Ct. 1985)); *accord Huster v. j2 Cloud Servs., Inc.*, 682 Fed. Appx. 910, 917 (Fed. Cir. 2017) ("To toll the statute of limitations, the plaintiff must prove: '(1) actual fraud on the part of the defendant involving moral turpitude, (2) which conceals the existence of a cause of action from the plaintiff, and (3) plaintiff's reasonable diligence in discovering his cause of action despite his failure to do so within the time of the applicable statute of limitations.'" (quoting *Jim Walter Corp.*, 265 S.E.2d at 9)) (applying Georgia law).

[121]   *See Bohus v. Beloff*, 950 F.2d 919, 926 (3d Cir. 1991) ("[T]he inquiry under the fraudulent concealment doctrine is the same as that under the discovery rule.");

Under the discovery rule, "[t]he commencement of the limitations period is grounded on 'inquiry notice' that is tied to 'actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause.'"[122]

In addition, "[t]he party seeking to invoke the discovery rule bears the burden of establishing the inability to know the injury despite the exercise of reasonable diligence."[123] "The standard of reasonable diligence is objective, not subjective," and "is not a standard of reasonable diligence unique to a particular plaintiff, but instead, a standard of reasonable diligence as applied to a 'reasonable person.'"[124] Reasonable diligence is generally a question of fact for a jury but may be resolved as a matter of law where the underlying facts are not in dispute.[125]

---

[122] *Gleason v. Borough of Moosic*, 15 A.3d 479, 484 (Pa. 2011) (quoting *Wilson v. El-Daief*, 964 A.2d 354, 364 (Pa. 2009)); *see also Fine*, 870 A.2d at 858 ("[T]here are [very] few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence." (quoting *Crouse v. Cyclops Indus.*, 745 A.2d 606, 611 (Pa. 2000)) (alterations in original)); *Rice v. Diocese of Altoona-Johnstown*, 255 A.3d 237, 255 (Pa. 2021) ("We acknowledged in Wilson, and do so now, again, that the inquiry notice approach is strict and can be perceived as harsh. It is, however, reflective of our discernment of legislative intent. Providing relief from the consequences of the harshness is not in the purview of this [c]ourt.")

[123] *Dalrymple*, 701 A.2d at 224 (citing *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983)). Although ABIC doesn't explicitly refer to the discovery rule, it does contend that it acted with reasonable diligence in pursing its claims. *See* Opp., Doc. 122 at 25. The Court interprets ABIC's reference to its reasonable diligence as an argument regarding the accrual of its injury under the discovery rule.

[124] *Id.* (quoting *Redenz*, 520 A.2d at 886); *accord Jim Walter Corp. v. Ward*, 265 S.E.2d 7, 9 (Ga. 1980) (explaining that, in the fraudulent-concealment context, "reasonable diligence . . . must be measured by the prudent-man standard which is an objective one").

[125] *See Wilson*, 964 A.2d at 359; *accord Cochran Mill Associates v. Stephens*, 648 S.E.2d 764, 769 (Ga. Ct. App. 2007) ("[A]lthough issues concerning a plaintiff's diligence in discovering

ABIC contends it was reasonably diligent in pursuing its claims, explaining that it could not have reasonably known of its claims until November 2017, when it deposed Kurt DeYulis and Karen Ligda in connection with the Western District Litigation and learned that that Kurt DeYulis provided substantive (and, apparently, materially false) information on Custom's insurance application to ABIC.[126] Ebensburg argues that ABIC possessed sufficient information to reasonably know of its claims by September 14, 2015, when it realized that Custom was in fact engaged in operations at heights above fifteen feet.[127] The Court agrees with Ebensburg and concludes that ABIC had sufficient knowledge to be on inquiry notice of its potential claims against Ebensburg on September 14, 2015.

In this transaction, the legal relationship between the parties is as follows: Custom was a principal, Ebensburg was Custom's legal agent, and ABIC was a third party that was harmed by actions Ebensburg took on Custom's behalf. When an agent like Ebensburg commits tortious acts in the scope of its agency, both the agent and principal are equally liable in tort.[128] ABIC was aware (or should have been) of the principal-agent relationship between Custom and Ebensburg because the only way for a customer like Custom to obtain ABIC's insurance was to go through a

---

fraud usually must be resolved by the trier of fact, this is not always the case. A party may fail to exercise due diligence as a matter of law.").
[126] Opp., Doc. 122 at 26.
[127] MSJ Br., Doc. 132 at 17-18.
[128] Restatement (Second) of Agency, § 343 (1958).

Retail Agency (like Ebensburg) that had powers of representation with ABIC and access to eQuotes.[129]

James Scott was injured on September 8, 2015.[130] On that day, ABIC was aware that Scott "fell through a roof."[131] On September 14, 2015, email correspondence between ABIC employees indicates that they became aware of the misrepresentations in Custom's application, which those employees acknowledged was submitted via eQuotes.[132] Accordingly, ABIC was aware that the mechanism by which it was injured was eQuotes.

Therefore, by September 14, 2015, ABIC was aware that (1) someone submitted false information to it via eQuotes and (2) only Ebensburg, and not Custom, had access to the eQuotes system. The Court concludes that those facts are sufficient to give ABIC inquiry notice of its potential claims against Ebensburg because it knew that Ebensburg had sole access to the mechanism that caused its injury.

Pennsylvania courts have "generally found the discovery rule inapplicable in cases where a plaintiff was aware of an injury and its cause but had not determined

---

[129]   *See, e.g.*, Sirmans Dep., Doc. 105-16 at 138:10-139:17; Byers Dep., Doc. 105-30 at 72:6-75:1, 79:17-81:25; *see also* ABIC ACORD, Doc. 109-30 (listing Ebensburg as Custom's insurance agent).
[130]   *See* NCP, Doc. 105-20.
[131]   *Id.* (under Injury Information).
[132]   *See* Sept. 14 Email Exchange, Doc. 105-18; *see* Krause Dep., Doc. 105-28 at 51:9-52:3.

the identity of the defendants within the limitations period."[133] Here, ABIC was aware of the identity of two potential defendants, and it simply chose to sue one of them. It therefore appears that before ABIC deposed Kurt DeYulis in November 2017, it simply assumed that he (or some other Ebensburg employee) acted as a mere scrivener or intermediary between ABIC and Custom. Under ABIC's assumption, an Ebensburg employee relayed ABIC's questions to Custom and submitted Custom's answers back to ABIC on eQuotes verbatim.[134]

But ABIC doesn't identify a basis for that assumption, much less one sufficient to invoke equitable tolling. Perhaps that's the way things were supposed to be done. But ABIC could have just as easily assumed what actually turned out to be the case—that Kurt DeYulis negligently relied on stale information about Custom's operations without confirming its accuracy when he submitted Custom's application via eQuotes. ABIC could also have assumed that an Ebensburg employee

---

[133] *Guenther v. Quartucci*, 1996 WL 67616, at *2 (E.D. Pa. Feb. 12, 1996) (citing *DeMartino v. Albert Einstein Medical Ctr., N. Div.*, 460 A.2d 295, 304 n.16 (Pa. Super. 1983) ("The fact that appellant may not have known the identity of the dentist who performed the work is not relevant to the start of the limitations statute."); *Keating v. Zemel*, 421 A.2d 1181, 1183-84 n.4 (Pa. Super. 1980) (finding that Pennsylvania case law does not extend the statute of limitations to allow identification of culpable parties in the absence of fraud or concealment); *see also Piccolini v. Simon's Wrecking*, 686 F. Supp. 1063, 1073 (M.D. Pa. 1988) ("There is nothing in the [discovery] rule that provides for the further tolling of the [statute of limitations] until every responsible party can be identified."); *Merry v. Westinghouse Elec. Corp.*, 684 F. Supp. 852, 855 (M.D. Pa. 1988) ("Nothing in the discovery rule provides for the tolling of the statute until the responsible party is identified.");

[134] ABIC's Western District complaint appears to be consistent with that assumption. *See Am. Builders Ins. Co. v. Custom Installations Contracting Servs., Inc.*, CV 3:15-295, ECF Doc. 1 ¶ 8 (alleging that Custom answered a question about the nature of its business "by inserting *or by causing to be inserted* the phrase 'Commercial Remodeling'" (emphasis added)), ¶¶ 9-16 (alleging that Custom "answered" several questions falsely).

negligently made a typo or mistakenly mixed-up applications of two different customers.

Put differently, even without knowledge of Kurt DeYulis' substantive involvement with Custom's application, ABIC could have plausibly alleged its claims against Ebensburg because it was aware that Ebensburg had sole access to the mechanism of its injury.[135] That may not be sufficient to determine the "precise cause" of ABIC's injury, but it's certainly sufficient to give ABIC inquiry notice that it had potential claims against Ebensburg. Therefore, the question is not whether ABIC "should have acted with greater diligence"—which is an issue for the jury— because ABIC had the necessary information to bring its claims on September 14, 2015.[136]

Take Count III for example.[137] The evidence in the record shows that ABIC had sufficient information to bring a negligent misrepresentation claim against

---

[135] Consider an imperfect but perhaps helpful analogy to a situation that occurs on a frequent basis in this Court and others. A commercial truck driver, through his own negligence, causes a car accident, injuring another driver. The injured driver has a potential claim against both the driver's employer (which is, like Custom, the principal) and the driver (which is, like Ebensburg, the agent). The injured driver can sue both regardless of the fact that she doesn't know whether the truck driver's negligent driving caused the accident or whether the employer failed to properly maintain the truck's brakes, causing the accident. At the outset of a case, that is to say, before any discovery, both theories are equally likely. The injured driver could allege either one and would have stated a plausible claim. *Cf. Bates v. Metro. Transit Sys., Inc.*, 197 S.E.2d 781, 782 (Ga. Ct. App. 1973) (rejecting the plaintiff's fraudulent concealment argument because he "had all the facts with reference to the accident in which he was injured within a few weeks after the accident, including the name and address of the driver and . . . did nothing to verify or determine the identity of the transit company which was operating the bus").

[136] *Gleason*, 15 A.3d at 487.

[137] Count III serves as a good example because the only additional element ABIC would have to allege for the purposes of Count II (professional negligence) is that Ebensburg had professional duties as an insurance agent. It was aware of Ebensburg's professional status as an insurance

Ebensburg as of September 14, 2015.[138] Based on its September 14, 2015 realization that Custom was doing roofing work, ABIC knew that someone made a misrepresentation, which is the first element of a negligent misrepresentation claim. As expressed above, it had sufficient information to allege that Ebensburg made the misrepresentation because Ebensburg had access to eQuotes and physically entered the false information into eQuotes. The September 14, 2015 Email Exchange also shows that ABIC knew that the misrepresentation was material, as it no longer underwrote roofing risks.

Moving on to the second element, ABIC also had sufficient information to allege that Ebensburg should have known that its misrepresentation was false, although the Court acknowledges that the question is close. Throughout this litigation, ABIC has continually maintained that Ebensburg owed it a "professional dut[y] to use reasonable care in the submission of information contained in

---

agency long before September 2015. As for Count IV (fraudulent misrepresentation), the only additional element necessary there is that Ebensburg acted intentionally. Rule 9 of the Federal Rules of Civil Procedure would have allowed ABIC to allege Ebensburg's intent generally on September 14, 2015.

[138] The elements of negligent misrepresentation are the same in both Georgia and Pennsylvania. *Compare Gongloff Contracting, L.L.C. v. L. Robert Kimball & Associates, Architects & Engineers, Inc.*, 119 A.3d 1070, 1076 (Pa. Super. Ct. 2015) ("The elements of a common law claim for negligent misrepresentation are: '(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation.'" (quoting *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 277 (Pa. 2005))), *with Smiley v. S & J Investments, Inc.*, 580 S.E.2d 283, 288 (Ga. Ct. App. 2003) ("The essential elements of negligent misrepresentation are: '(1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance.'" (quoting *Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc.*, 479 S.E.2d 727, 729 (Ga. 1997))).

applications, questionnaires, and risk questionnaires to [ABIC] for the purpose of obtaining insurance policies for [Ebensburg's] clients."[139] ABIC specifically advised all Retail Agencies—including Ebensburg—of the need to supply accurate information on eQuotes.[140] ABIC was also under the impression that Ebensburg and the other Keystone Retail Agencies were subject to the Agency Agreement, which contained a duty to disclose all material changes regarding a policyholder.[141] From this information, the Court concludes that ABIC had at least inquiry notice of its ability to allege that Ebensburg misrepresented facts in circumstances under which Ebensburg should have known the misrepresentation to be false.[142]

The third element of negligent misrepresentation requires that the defendant misrepresent a fact "with an intent to induce another to act on it."[143] There is no dispute that Ebensburg intended for ABIC to rely on the information it submitted via

---

[139] Compl., Doc. 1 ¶ 66.

[140] 2009 Underwriting Guidelines, Doc. 109-15 at 7 (advising Retail Agencies that they should "take care to enter the information into the eQuotes system as accurately and completely as possible since this data will be used to issue the policy" and "[a]ny spelling, pay plan, payroll, class code or other errors will be reflected in the issued policy.").

[141] *See* Maupin Dep., Doc. 138-2 at 54:12-58:16 (expressing that ABIC understood the Retail Agencies to be Keystone's subagents and subject to the protections of the Agency Agreement); Agency Agreement, Doc. 109-7, at 3 (explaining Keystone's duty to disclose material changes in a policyholder's business).

[142] Furthermore, ABIC fails to explain why it waited nearly two years after learning in November 2017 that Kurt DeYulis provided substantive information on Custom's application before filing its original Complaint against Ebensburg on August 28, 2019. In the Court's view, a reasonable response would have been to immediately join Ebensburg as a defendant in the Western District Litigation.

[143] *Gongloff Contracting*, 119 A.3d at 1076; *accord Clemente*, 668 S.E.2d at 749.

eQuotes.[144] eQuotes was how Ebensburg obtained insurance coverage for its clients. That arrangement was in place long before September 2015.

The last element requires that the defendant misrepresented a fact that "result[ed] in injury to a party acting in justifiable reliance on the misrepresentation."[145] Again, there is no dispute that ABIC knew it suffered an injury by September 14, 2015 as a result of relying on either Custom's or Ebensburg's misrepresentation.

The common thread in these elements is that ABIC knew that the alleged misrepresentation negligently or fraudulently came from two potential sources, Custom or Ebensburg (or both), and it knew that Ebensburg had access to eQuotes, the mechanism that caused its injury. Rather than pursuing both potential sources, ABIC assumed that the misrepresentation originated with Custom rather than Ebensburg. ABIC eventually learned that its assumption was incorrect, but not until after the statute of limitations expired on its claims in September 2017.[146]

## IV.   CONCLUSION

---

[144]  *See* 2011 Roofing Workers' Compensation Underwriting Guidelines, Doc. 109-18 at 5 ("Our eQuotes system is available for your Roofing Workers Compensation submissions. It will be the primary means of submitting and tracking your business. We recommend that you use this system for quoting and binding coverage.").

[145]  *Gongloff Contracting*, 119 A.3d at 1076; *accord Clemente*, 668 S.E.2d at 749.

[146]  Accordingly, the Court need not intensely analyze how tolling and accrual principles would affect the relevant Georgia statute of limitations for ABIC's claims. Under either state's law, they would be tolled until the same day, upon which the statutes of limitation would begin to run. As expressed above, because Georgia's relevant statute of limitations are four and six years, Pennsylvania's two-year statute of limitations will always be shorter.

Complicated business arrangements lead to complicated litigation, as is evident in this matter. The Court acknowledges that litigators in these circumstances must toe a difficult line. On the one hand, they must ensure a reasonable factual basis for their client's allegations. On the other, they face strictly construed statutes of limitations. Here, ABIC appears to have fallen on the wrong side of that line. By failing to act on its knowledge that Ebensburg had access to eQuotes, the mechanism by which ABIC was injured, ABIC ran afoul of the statute of limitations. For that reason, Ebensburg's motion for summary judgment is granted.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge